**In re WOLVERINE RADIO COMPANY, Debtor.**

**MICHIGAN EMPLOYMENT SECURITY COMMISSION,**
**Plaintiff–Appellee/Cross–Appellant,**

**v.**

**WOLVERINE RADIO COMPANY, INC.,**
**Defendant–Appellant/Cross–Appellee.**

**Nos. 89–2020, 89–2040.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 22, 1991.

Decided April 8, 1991.

Rehearing Denied June 25, 1991.

---

David A. Voges, Asst. Atty. Gen., Lansing, Mich., Donna K. Welch (argued), Detroit, Mich., for plaintiff-appellee/cross-appellant.

Rozanne M. Giunta (argued), Miller, Canfield, Paddock & Stone, Lansing, Mich., for defendant-appellant/cross-appellee.

Before GUY and BOGGS, Circuit Judges, and EDWARDS, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

This appeal concerns the effect of a bankruptcy proceeding on the Michigan Employment Security Commission's (MESC) power to assign, to a purchaser of a debtor's assets, the debtor's rate of contribution to Michigan's unemployment trust fund. Debtor Wolverine Radio Company, Inc. (Wolverine) appeals and MESC cross-appeals from an order of the district court reversing the bankruptcy court order prohibiting MESC from assigning the experience rating of Wolverine to Wolverine's statutory successor, JOSI Broadcasting Company (JOSI), or charging JOSI's experience account for unemployment compensation paid to former employees of Wolverine who are not employees of JOSI.[1]

---

1. JOSI, the ultimate successor to the debtor, is actually the assignee of Patten Corporation, the purchaser of the debtor's assets.

Wolverine argues on appeal that (1) the district court erred in its ruling that MESC may assign the debtor's experience rating and resulting contribution rate to the purchaser of assets when the sale was made in the bankruptcy court free and clear of all liens, claims, and interests, pursuant to 11 U.S.C. § 363; (2) the district court erred in ruling that MESC may include unemployment compensation payments made subsequent to the sale to Wolverine's former employees when computing the purchaser's experience rating; and (3) the district court ruled in error that Wolverine's negative reserve balance, which resulted when the benefits paid to employees of Wolverine exceeded Wolverine's payment of unemployment taxes, would transfer to the purchaser of assets and should be reduced only by the amount of MESC's allowed claim for unpaid taxes against the debtor.[2] Wolverine maintains that the negative reserve balance is a debt or right to payment discharged in bankruptcy and must be eliminated in its entirety when calculating the contribution rate of JOSI.

On cross-appeal, MESC argues that the bankruptcy and district courts have no jurisdiction to determine the tax liability of JOSI, a nondebtor, and requests reversal of the district court holding that MESC must treat the debtor's past-due contribution obligations as paid on the date of discharge, thereby limiting the amount of the negative reserve balance that could be utilized in calculating the experience rating and subsequent contribution rate for JOSI.

For the reasons set forth below, we affirm.

## I.

The parties have stipulated to substantially all of the pertinent facts. Wolverine, whose assets included radio broadcast equipment and a radio tower, operated a radio station in Midland, Michigan, under the call letters WRCI. In April 1984, Wolverine filed for protection under Chapter 11 of the Bankruptcy Code, and, in September 1985, the bankruptcy court confirmed the debtor's plan of reorganization (plan). Included in the confirmed plan was MESC's claim for unpaid taxes, interest, and penalties, which were allowed in the amount of $7,606.91. The plan also incorporated by reference a letter of intent executed by Wolverine and Patten Corporation providing for "free and clear" sale of Wolverine's assets. In January 1986, JOSI, as the assignee of Patten Corporation, acquired the broadcasting equipment and tower of the debtor, and was assigned the radio license of Wolverine by the Federal Communications Commission. The purchaser paid $340,000 for these assets but did not acquire the debtor's accounts receivable, valued at $19,000, or any cash or pre-paid assets.

The purchase agreement between Wolverine and Patten, pursuant to which the sale was consummated, states in paragraph 11(g):

WOLVERINE will hold at Closing good and marketable title to all property and assets listed or described in attached Exhibits A free and clear of any mortgages, liens, pledges, charges, security agreements, claims or encumbrances.

The purchase agreement also states at paragraphs 12(c), 17, and 23, respectively:

It is specifically understood that PATTEN by implication, by operation of law or any equitable proceedings, or otherwise, does not assume any local, state or federal tax liabilities or any other liabilities and obligations of WOLVERINE, as may result from the sale of its assets and property to PATTEN.

WOLVERINE agrees to and does hereby indemnify PATTEN against and save it harmless from any and all liabilities, loss, cost, expense, damage, set-off or recoupment, including reasonable amounts for attorneys' fees which may be asserted against PATTEN arising out of the operation of WRCI–FM on or prior

---

**2.** Contributions required under the Michigan Employment Security Act (MESA), MICH.COMP. LAWS ANN. § 421.1 *et seq.*, are taxes. *Michigan*

*Employment Sec. Comm'n v. Patt,* 4 Mich.App. 228, 144 N.W.2d 663 (1966); *see also Missouri v. Gleick,* 135 F.2d 134 (8th Cir.1943).

to the Closing Date by reason of the purchase and sale hereunder. . . .

This Agreement shall be construed and enforced in accordance with the laws of the State of Michigan.

The plan of reorganization addresses tax claims in pertinent parts of articles II and III, which read as follows:

*Classification of Claims and Interests*

All claims against and interests in the Debtor will be dealt with by the Plan. Only such claims and interests as are allowed by the Court, pursuant to Section 502(a), shall receive a distribution in accordance with the terms of the Plan. Claims against and interests in the Debtor are classified as follows:

. . . .

C. *Class 3. Tax Claims.* Class 3 shall be comprised of all allowed tax claims of any governmental agency, whether unsecured or secured by property of the Debtor.

. . . .

*Provisions for Satisfying Classes of Claims or Interests*

Claims and interests which are not allowed by this Court shall not receive any distribution of any nature whatsoever under the Plan. Allowed claims and interests, including both those classes which are not impaired under the Plan

**3.** It appears that JOSI did not indicate that it was a successor corporation when it filed with MESC.

**4.** Under MESA, Michigan employers are required by state law to remit payments to the MESC to maintain the fund from which unemployment benefits are paid to workers who have lost their jobs through no fault of their own. MICH.COMP.LAWS ANN. §§ 421.2, 421.13. An employer's rate of contribution under MESA is obtained through application of a complicated statutory formula. *See* MICH.COMP LAWS ANN. § 421.19. In the simplest case, a new employer is merely required to provide MESC with a 2.7 percent contribution. *See* MICH.COMP.LAWS ANN. § 421.19, Table A (year one of contribution of liability). In the most complex case, an employer with an experience rating based on years of participation must make contributions at a rate computed by a four-factor formula. *Id.* (years five and over of contribution liability) and § 421.19a.

and those classes which are impaired under the Plan, shall be treated as follows:

. . . .

C. *Class 3.* The allowed claims included in Class 3 shall be paid in full, in installment payments to be made from the Creditors Fund, over a period of five (5) years from the effective date of the Plan, in twenty (20) equal payments, together with interest at the statutory rates, in accordance with the provisions of Section 1129(a)(9)(C) of the Bankruptcy Code. These claimants shall be secured by an irrevocable letter of credit.

In April 1986, MESC wrote to JOSI to inform the company that its MESC contribution rate (the required rate of payment to the employment security fund) was 2.7 percent based on its status as a new employer. Later that year, however, MESC wrote to JOSI and altered its earlier statement; MESC expressed its intent to treat JOSI as the successor to WRCI, and MESC accordingly pegged JOSI's contribution rate for 1986 at 10 percent based on WRCI's poor contribution history when under Wolverine's ownership.[3] The MESC contribution rate for JOSI was calculated utilizing the prior 60–month debtor's history of payroll and benefit charges (the chargeable benefits component) and the debtor's negative reserve balance of $18,293 (the account building component).[4] In

There are four components that comprise the unemployment tax for employers with an employment history: (1) chargeable benefits component (CBC); (2) nonchargeable benefits component; (3) account building component (ABC); and (4) solvency tax. Of the foregoing elements, the CBC and the ABC are directly related to the employer's employment history, and directly affect the employer's "experience rating."

The CBC serves somewhat as an insurance premium, using past claims to determine future contributions. (The CBC is the benefits charged over a five-year period divided by the total taxable payroll of the employer for the same period. This is subject to a six percent cap, and could drop to zero if no benefits have been paid over a five-year period. MICH.COMP.LAWS ANN. § 421.19(a)(3)). Wolverine objects to the use of past claims filed by its employees, resulting in payments made subsequent to the reorganization plan, to determine the future contributions of JOSI.

1987, JOSI was notified by MESC that the contribution rate for the calendar year 1987 would continue at 10 percent, but the negative reserve balance had been reduced to $11,130.71 based on payments made by JOSI during the year 1986. JOSI's reserve account continues to be charged for unemployment benefits being paid to Wolverine's former employees who were never employed by JOSI.

As a result of the action taken by MESC, Wolverine returned to the bankruptcy court. In response to a motion by Wolverine, the bankruptcy court entered its "ORDER ENFORCING THIS COURT'S ORDER CONFIRMING DEBTOR'S PLAN OF REORGANIZATION AND PROHIBITING THE M.E.S.C. FROM ASSIGNING DEBTOR'S EXPERIENCE RATING TO PURCHASERS." It is this order that MESC appealed to the district court. After briefing and oral argument, the district court ordered that (1) MESC must treat Wolverine's past-due contribution obligations, which were recognized in the plan as a claim of $7,601.91 to be paid over a period of five years, as paid on the date of discharge; (2) MESC has the authority to assign Wolverine's experience rating, used

to gauge an employer's rate of contribution, to JOSI; and (3) MESC has the power to include unemployment compensation payments made to former Wolverine employees in the computation of JOSI's experience rating and resulting contribution rate. Wolverine appeals from this order and MESC cross-appeals.

## II.

■■■ We first examine MESC's argument that the bankruptcy court has no subject matter jurisdiction to determine the tax liability of JOSI.[5] Wolverine's response to this argument is that MESC consented to jurisdiction when it stipulated to a set of facts admitting to jurisdiction in the bankruptcy court, and that MESC is precluded from raising on appeal for the first time the issue of subject matter jurisdiction. Notwithstanding what transpired in this action prior to the pending appeal, the federal courts are courts of limited jurisdiction and have a continuing obligation to examine their subject matter jurisdiction throughout the pendency of every matter before them.[6] Parties can neither

---

The ABC, on the other hand, is more retrospective and functions to replenish a negative account balance in the situation where benefits paid have exceeded contributions to an employer's account. (This is calculated by netting total contributions paid in by an employer against all benefits paid out. This actual reserve is compared to the statutory required reserve of $3\frac{3}{4}$ percent of the last year's payroll. The difference between the two is multiplied by one-half. This total is the ABC, which is subject to a three percent cap. MICH.COMP.LAWS ANN. § 421.19(a)(4)). The "reserve balance" is a fund which is accumulated from payments of unemployment taxes paid by an employer. If any employee of the employer begins to collect unemployment benefits, this reserve account is reduced. This reserve account may have a "negative reserve balance" if the benefits paid to employees of the employer exceed the reserve account provided for. Wolverine had a negative reserve balance of $18,293.44. If Wolverine had continued operations, the MESC would have had a right to payment of the negative reserve balance, which would have been collected through Wolverine's increased contribution rate in subsequent years. Wolverine argues against MESC's ability to utilize its negative reserve balance in computing the experience rating of JOSI.

5. MESC further asserts that the bankruptcy and district courts lacked personal jurisdiction over MESC to enter valid orders binding the agency because due process requirements of notice and opportunity to be heard on the experience rating transfer issue did not precede the bankruptcy court's approval of the purchase agreement or reorganization plan. Even if we assume, however, that MESC received no notice prior to confirmation of the plan that Wolverine intended the terms of the sale to include JOSI's tax liability to MESC, we find that personal jurisdiction over MESC has been acquired due to its appearance and participation in the litigation. MESC appeared before both the bankruptcy court and the district court to argue the merits of Wolverine's motion for order enforcing the bankruptcy court's order confirming the plan, which motion required resolution of the tax liability issue now presented to this court. Any defects in personal jurisdiction have thus been waived. *See In re Grand Jury Proceedings*, 654 F.2d 268, 271 (3d Cir.), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981).

6. The Supreme Court explained this principle as follows:

Subject-matter jurisdiction ... is an Art. III as well as a statutory requirement; it func-

waive nor consent to subject matter jurisdiction, *In re Rini,* 782 F.2d 603, 608 (6th Cir.1986), and we are duty bound to consider on appeal whether the courts below exceeded their statutory authority by entertaining arguments regarding JOSI's tax liability to MESC and in entering orders determining that liability. *See id.* at 609. We review questions of jurisdiction *de novo. In re Castlerock Properties,* 781 F.2d 159, 161 (9th Cir.1986). For the reasons that follow, we find that the bankruptcy and district courts have jurisdiction over this matter.

## A. 11 U.S.C. § 505

■ Pursuant to 11 U.S.C. § 505(a), bankruptcy courts have jurisdiction to hear and determine the amount and legality of unemployment compensation taxes incurred by debtors or their estate. *In re Pine Knob Inv.,* 20 B.R. 714, 715 (Bankr.E. D.Mich.1982); *In re A.C. Williams Co.,* 51 B.R. 496, 497 (Bankr.N.D.Ohio 1985). Section 505(a)(1) of the Bankruptcy Code provides:

> Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

11 U.S.C. § 505(a)(1).

■ MESC challenges the bankruptcy court's jurisdiction to determine the tax liability of JOSI by arguing that 11 U.S.C. § 505(a)(1) limits determinations of tax liability to taxes of the debtor or estate. MESC contends that, where the court is being asked to determine the tax liability of

a nondebtor, jurisdiction does not lie pursuant to section 505(a). Several courts have ruled that under appropriate circumstances the bankruptcy court may apply section 505(a) to determine the tax liability of parties other than the debtor. *In re Jon Co.,* 30 B.R. 831 (D.Colo.1983); *In re H & R Ice Co.,* 24 B.R. 28 (Bankr.W.D.Mo.1982); *In re Major Dynamics, Inc.,* 14 B.R. 969 (Bankr.S.D.Cal.1981). However, because the "appropriate circumstances" illustrated by those cases do not exist here, and because recent cases indicate that the consensus has shifted away from extending section 505(a) to parties other than the debtor, we conclude that the bankruptcy court did not have jurisdiction under section 505(a) to adjudicate the tax liability of JOSI.

In *Major Dynamics,* a creditors committee filed a motion in bankruptcy court seeking to stay IRS audits, assessments, and collections directed at the creditors. The court held that jurisdiction could be exercised under section 505(a) to determine the tax liability of a nondebtor:

> [T]he jurisdictional grant to this Court could extend to tax disputes of third parties other than the debtor *provided, however,* that the IRS activity to be enjoined directly affected the debtor or the estate, and that the exercise of such jurisdiction was necessary to the rehabilitation of the debtor or the orderly and efficient administration of the debtor's estate.

14 B.R. at 972 (emphasis in original).

In *Jon* and *H & R Ice,* the courts were asked to determine the 26 U.S.C. § 6672 tax liability of the debtors' employees, and, finding the reasoning in *Major Dynamics* persuasive, they concluded that they had jurisdiction to do so under section 505(a).[7] *In re Jon,* 30 B.R. at 833; *In re H & R Ice,*

---

tions as a restriction on federal power, and contributes to the characterization of the federal sovereign. Certain legal consequences directly follow from this. For example, no action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant, principles of estoppel do not apply, and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102

S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982) (citations omitted).

**7.** Each of these cases also predicated jurisdiction on an alternative statutory provision, 28 U.S.C. § 1471, the predecessor to 28 U.S.C. § 1334. *In re Major Dynamics,* 14 B.R. at 972; *In re Jon,* 30 B.R. at 833; *In re H & R Ice,* 24 B.R. at 30. We will address jurisdiction pursuant to section 1334 in due course.

24 B.R. at 31. However, as the above passage quoted from *Major Dynamics* illustrates, the reasoning relied upon by these courts qualified the extension of jurisdiction to those disputes directly affecting the debtor or estate and where the exercise of jurisdiction was necessary to the rehabilitation of the debtor or the effective administration of the estate. *See In re Jon,* 30 B.R. at 833–34 (debtor has standing to challenge a tax penalty assessment against a third party, and bankruptcy court has power under section 505(a)(1) to rule on the third party's liability where debtor has sufficient personal stake in the outcome of the controversy to ensure concrete adversity and sharply defined issues).

In the case at bar, the debtor has no personal stake in the outcome of the controversy, as the contribution rate assessed to JOSI by MESC has no direct effect on the debtor or the estate and in no way implicates the rehabilitation of the debtor or the administration of the debtor's estate.[8] JOSI's prospective tax liability has no practical impact on the implementation of Wolverine's reorganization plan, and the relief granted by the bankruptcy court results in a pecuniary benefit accruing, not to the debtor, but to the successor, who filed no petition invoking jurisdiction over its status, assets, or estate.

Even if we were to conclude that JOSI's contribution rate will somehow affect Wolverine, adopting the *Major Dynamics* rationale would require us to rely on a literal interpretation of the clause stating that a bankruptcy court "may determine the amount or legality of *any* tax." 11 U.S.C. § 505(a)(1) (emphasis added). If the bankruptcy court could pass on the legality of

*any* tax, *Major Dynamics* and its progeny reasoned, then the court could certainly exercise jurisdiction over third parties whose tax liability was somehow related to that of the debtor. However, in the last few years virtually all the courts which have considered the issue have concluded that section 505(a) does not extend the bankruptcy court's jurisdiction to parties other than the debtor. *United States v. Huckabee Auto Co.,* 783 F.2d 1546 (11th Cir.1986); *In re Brandt–Airflex Corp.,* 843 F.2d 90, 94–96 (2d Cir.1988); *In re Interstate Motor Freight Sys.,* 62 B.R. 805 (Bankr.W.D.Mich.1986).[9] We agree with *Interstate Motor Freight,* 62 B.R. at 809, that a literal reading of section 505(a) could lead to absurd results: "[T]aken at face value, without recourse to the legislative history, § 505 makes the Bankruptcy Courts a second tax court system, empowering the Bankruptcy Court to consider 'any' tax whatsoever, on whomsoever imposed."

Section 505(a) is described in the legislative history as "permit[ting] determination by the bankruptcy court of any unpaid tax liability *of the debtor.*" S.Rep. No. 989, 95th Cong., 2d Sess. 67, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5853; H.R.Rep. No. 595, 95th Cong., 2d Sess. 356, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6312 (emphasis added). The Second Circuit looked to this legislative history and concluded that "it makes far more sense to read § 505(a) as limiting the bankruptcy court's jurisdiction, than to accord it the unrestricted reading favored by *Major Dynamics.*" *In re Brandt–Airflex,* 843 F.2d at 96. The Eleventh Circuit has concluded that under section 505(a), "[t]he

---

**8.** Although MESC's allowed claim for $7,606.91 in unpaid taxes is implicated, the debtor's liability on this claim is not at issue. MESC concedes that Wolverine's preexisting liability for past-due contributions and the liens which accompanied that liability were encompassed by the plan. The issue on appeal, insofar as the $7,606.91 in unpaid taxes is concerned, is whether or not those unpaid taxes should be considered as satisfied for purposes of establishing JOSI's experience rating.

**9.** *See also In re Success Tool & Mfg. Co.,* 62 B.R. 221 (N.D.Ill.1986); *In re East Wind Indus.,* 61

B.R. 408 (D.N.J.1986); *In re Booth Tow Serv., Inc.,* 53 B.R. 1014 (W.D.Mo.1985); *In re Educators Inv. Corp.,* 59 B.R. 910 (Bankr.D.Nev. 1986); *but see In re Campbell Enter., Inc.,* 66 B.R. 200 (Bankr.D.N.J.1986) (finding jurisdiction to determine tax liability of nondebtor without citing recent decision to the contrary by district court in New Jersey). Most of these recent cases arose under 26 U.S.C. § 6672 and involved challenges by both debtors and their "responsible" employees to IRS assessments against the employees for withholding taxes.

jurisdiction of the bankruptcy courts encompasses determinations of the tax liabilities of debtors who file petitions for relief under the bankruptcy laws. It does not, however, extend to the separate liabilities of taxpayers who are not debtors under the Bankruptcy Code." *Huckabee*, 783 F.2d at 1549.

We find persuasive the Third Circuit's analysis of section 505(a) in *Quattrone Accountants, Inc. v. IRS*, 895 F.2d 921 (3d Cir.1990). Although *Quattrone* held that section 505 does not *grant* jurisdiction to determine the tax liability of a nondebtor, it also concluded, contrary to the Second Circuit in *Brandt–Airflex*, that section 505 does not *limit* the bankruptcy court to determining only a debtor's tax liability.

*Quattrone*, 895 F.2d at 924–25.[10] Given the legislative history of section 505 and its placement in a chapter of the Bankruptcy Code denoted "Creditors, the Debtor, and the Estate," section 505 is not applicable where the court is not dealing with the interrelationship and effect of creditors and their claims on the bankrupt debtor.[11] *Id.* at 925.

## B. 28 U.S.C. § 1334

■ In *Quattrone*, the court concluded that the bankruptcy court's jurisdiction over a case involving nondebtors was to be determined solely by 28 U.S.C. § 1334(b).[12] 895 F.2d at 926. We agree with the conclusion of that court.[13]

Section 1334 provides in relevant part:

---

**10.** The *Quattrone* court analyzed the legislative history of section 505 and ruled that the provision was intended to clarify the bankruptcy court's jurisdiction over tax claims, not limit jurisdiction only to debtors. The Third Circuit's analysis proceeds as follows:

> Section 505(a) was derived from Section 2(a)(2A) of the former Bankruptcy Act, 11 U.S.C. § 11(a)(2A). Section 2(a)(2A) was promulgated in 1966 in response to *Arkansas Corp. Comm's v. Thompson*, 313 U.S. 132, 61 S.Ct. 888, 85 L.Ed. 1244 (1941), in which the Supreme Court held that Section 64(a)(4) of the 1898 Bankruptcy Act did not empower the bankruptcy courts to redetermine and revise the value of a property for tax purposes when that value had already been determined by a state's quasi-judicial agency. In response to the Supreme Court's decision in *Thompson*, and to remedy the confusion caused by that decision about the bankruptcy court's jurisdiction with respect to taxes, Congress enacted Section 2(a)(2A). *See City of Amarillo v. Eakens*, 399 F.2d 541 (5th Cir.1968). Section 2(a)(2A) gave bankruptcy courts jurisdiction to:
>
> > Hear and determine, or cause to be heard and determined, any question arising as to the amount or legality of any unpaid tax, whether or not previously assessed, which has not prior to bankruptcy been contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction....
>
> When the Bankruptcy Act of 1978 was promulgated, Section 505 replaced Section 2(a)(2A). The legislative history of Section 505 emphasizes that it permits the bankruptcy court to determine the tax liability of a debtor "that has not been contested before or adjudicated by a judicial or administrative tribunal of competent jurisdiction before the bankruptcy case." S.Rep. No. 989, 95th Cong., 2d Sess. 67, *reprinted in* 1978 U.S.Code Cong. & Ad-

min.News 5787, 5853. The legislative history also emphasized the vitality of *Thompson*. *Id.* We conclude that Section 505 does not deny the bankruptcy court jurisdiction of claims of non-debtors; rather, its purpose is to deny jurisdiction to the bankruptcy court when, prior to bankruptcy, a tax claim has been "contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction." 11 U.S.C. § 505(a)(1).

*Quattrone*, 895 F.2d at 925 (footnote omitted).

**11.** While Wolverine, the appellant, is the debtor in this case, the real party in interest is Wolverine's successor, JOSI.

**12.** 28 U.S.C. § 157 allows the district court to refer to the bankruptcy court cases over which the district court has jurisdiction pursuant to section 1334.

**13.** Wolverine argues that jurisdiction in this case is also established by 11 U.S.C. § 105(a), which codifies the equitable powers of the court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." Wolverine cites *In re White Motor Credit Corp.*, 75 B.R. 944 (N.D.Ohio 1987), which determined that section 105 includes the authority to interpret or clarify prior orders, including purchasers' actions for declaratory and injunctive relief to enforce orders of sale. *Id.* at 947. However, section 105 also states that "the authority or responsibilities conferred upon the court under this title shall be determined by reference to the provisions relating to such judge, officer, or employee set forth in title 28." 11 U.S.C. § 105(c). This section "shall not be interpreted to exclude bankruptcy judges." *Id.* Thus, "[s]ection 105 is not without limits. It does not permit the court to ignore, supersede, suspend or even misconstrue the statute itself or

(a) Except as provided in subsection (b) of this section, the district court shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

Section 1334 lists four types of matters over which the district court has jurisdiction: (1) "cases under title 11," (2) "proceedings arising under title 11," (3) proceedings "arising in" a case under title 11, and (4) proceedings "related to" a case under title 11. The first category refers merely to the bankruptcy petition itself, filed pursuant to 11 U.S.C. §§ 301, 302, or 303. *Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579, 583 (6th Cir.1990); *In re Wood*, 825 F.2d 90, 92 (5th Cir.1987). Accordingly, the action before us is not a "case under title 11" within the meaning of

section 1334(a).[14] However, we do find that the action was a "proceeding" within the scope of section 1334(b), and thus the bankruptcy court had jurisdiction over this matter.

For the purpose of determining whether a particular matter falls within bankruptcy jurisdiction, it is not necessary to distinguish between the second, third, and fourth categories (proceedings "arising under," "arising in," and "related to" a case under title 11). These references operate conjunctively to define the scope of jurisdiction. *See In re Wood*, 825 F.2d at 93. Therefore, for purposes of determining section 1334(b) jurisdiction, it is necessary only to determine whether a matter is at least "related to" the bankruptcy. *Id.*

In *Robinson*, 918 F.2d at 583, we noted that the circuit courts have uniformly adopted an expansive definition of a related proceeding under section 1334(b) and its substantially identical predecessor under the Bankruptcy Reform Act of 1978, 28

the rules. The courts should exercise great care in this regard." 2 COLLIER ON BANKRUPTCY ¶ 105.02 (15th ed. 1990). Subsection 105(c) "means that section 105 (or any other title 11 provision) may not be used to expand the court's authority beyond the limits of title 28." *Id.* at ¶ 105.06. Consequently, even were we to view this case solely as a proceeding to obtain an order pursuant to section 105(a), the power of the bankruptcy and district courts to hear this case is limited to the grant of jurisdiction in 28 U.S.C. § 1334.

**14.** The distinction between a "case" in section 1334(a) and a "proceeding" in section 1334(b) may not be readily apparent, as once a petition is filed, all of the proceedings that follow, whether called controversies, contested matters, suits, actions, or disputes, will certainly be predicated upon, and occur in the unfolding of, the "case." *See* 1 COLLIER ON BANKRUPTCY ¶ 3.01[1][c][i] (15th ed. 1990). Although the argument could be made that a motion to enforce the order confirming the plan of reorganization falls within the term "cases under title 11," and thus within section 1334(a), we conclude that, given the legislative history of the statutory provision, such a motion is best characterized as a "proceeding" within the purview of section 1334(b). Although the Bankruptcy Reform Act of 1984 altered the 1978 legislation in several respects, guidance in interpretation is still furnished by the congressional history of the 1978 legislation:

[A]nything that occurs within a case is a proceeding. Thus, proceeding here is used in its broadest sense, and would encompass what are now called contested matters, adversary proceedings, and plenary actions under the current bankruptcy law. It also includes any disputes related to administrative matters in a bankruptcy case.

The use of the term "proceeding," though, is not intended to confine the bankruptcy case. Very often, issues will arise after the case is closed, such as over the validity of a purported reaffirmation agreement, proposed 11 U.S.C. § 524(b), the existence of prohibited post-bankruptcy discrimination, proposed 11 U.S.C. § 525, the validity of securities issued under a reorganization plan, and so on. The bankruptcy courts will be able to hear these proceedings because they arise under title 11. H.R.Rep. No. 595, 95th Cong., 2d Sess. 445, *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 5963, 6401.

Thus, the term "proceeding" is used to refer to the steps within the "case" and to any subaction within the case that may raise a disputed or litigated matter. 2 COLLIER ON BANKRUPTCY ¶ 301.03. Wolverine's motion to enforce the order confirming the plan cannot be properly characterized as a "case." *See also In re Salem Mortgage Co.*, 783 F.2d 626, 633 n. 18 (6th Cir. 1986); *In re A.H. Robins Co.*, 788 F.2d 994, 1009 (4th Cir.), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986).

U.S.C. § 1471(b). As the Third Circuit held:

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*. Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*In re Pacor, Inc.*, 743 F.2d 984, 994 (3d Cir.1984) (emphasis in original; citations omitted). We "have accepted the *Pacor* articulation, albeit with the caveat that 'situations may arise where an extremely tenuous connection to the estate would not satisfy the jurisdictional requirement.'" *Robinson*, 918 F.2d at 584 (quoting *In re Salem Mortgage Co.*, 783 F.2d 626, 634 (6th Cir.1986)); *accord In re Turner*, 724 F.2d 338, 341 (2d Cir.1983).

It may appear initially that, in conducting an inquiry pursuant to the *Pacor* test, we find ourselves conducting an inquiry tantamount to the one utilized in *Major Dynamics* for determining whether to extend the jurisdiction of section 505 to tax disputes of third parties. Under both *Pacor* and *Major Dynamics*, we would be determining the effect of the activity in dispute on the debtor or estate in order to determine if the respective statutory provisions (§ 505 or § 1334) granted to the bankruptcy court jurisdiction over the matter. *See In re Major Dynamics*, 14 B.R. at 972. However, we read the *Pacor* test to include a broader range of actions than the activity falling within the *Major Dynamics* inquiry. Under *Pacor*, the court has jurisdiction over proceedings that "could *conceivably* have *any* effect" on the debtor or

the debtor's estate, whereas *Major Dynamics* vested jurisdiction only if the adjudication of tax liability *"directly* affected" the debtor or estate, and "was *necessary"* to rehabilitation or administration. Moreover, while courts have recently moved away from an expansive reading of section 505, *Brandt–Airflex*, 843 F.2d at 95, the circuit courts have uniformly adopted the expansive reading of section 1334(b) articulated by *Pacor*.[15]

■ Wolverine argues that property of the estate is at stake in this matter because the purchase agreement between the debtor and JOSI provides that the debtor will indemnify and hold harmless JOSI "from any and all liabilities, loss, cost, expense, damage, set-off or recoupment, including reasonable amounts for attorneys' fees which may be asserted against [the purchaser] arising out of the operation of WRCI–FM on or prior to the Closing Date by reason of the purchase and sale hereunder." Wolverine argues that, to the extent that JOSI could invoke liability under the indemnification section of the purchase agreement, the assets of the debtor and the debtor's estate would be directly affected as a result of this court's decision.

Although several circuit courts have adopted the definition of "related to" that is supplied by the Third Circuit in *Pacor*, the application of that definition has produced varying results. In a case presenting an indemnification scenario similar to the one alleged here by Wolverine, the Ninth Circuit declined to find an effect on the estate being administered in bankruptcy:

> In *Pacor*, we held that a personal injury suit between Higgins and Pacor was not related to the bankruptcy of Johns Manville Corporation (Manville). Higgins filed suit against Pacor claiming personal injuries sustained from exposure to asbestos distributed by Pacor. Pacor then filed a third party claim for

---

**15.** The *Pacor* formulation has been adopted by the Fourth Circuit, *see In re A.H. Robins Co.*, 788 F.2d 994, 1002 n. 11 (4th Cir.1985) (dicta), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); the Fifth Circuit, *see In re Wood*,

825 F.2d at 93; the Eighth Circuit, *see In re Dogpatch, U.S.A., Inc.*, 810 F.2d 782, 786 (8th Cir.1987); and the Ninth Circuit, *see In re Fietz*, 852 F.2d 455, 457 (9th Cir.1988).

indemnification against debtor Manville. The district court ruled that the bankruptcy court had jurisdiction over the Pacor–Manville suit, but not over the Higgins–Pacor suit because it was not a proceeding related to the Manville bankruptcy. We affirmed, reasoning,

> the outcome of the Higgins–Pacor action would in no way bind Manville, in that it could not determine any rights, liabilities, or course of action of the debtor.... Even if the Higgins–Pacor dispute is resolved in favor of Higgins (thereby keeping open the possibility of a third party claim), Manville would still be able to relitigate any issue, or adopt any position, in response to a subsequent claim by Pacor. Thus, the bankruptcy estate could not be affected in any way until the Pacor–Manville third party action is actually brought and tried.

*Quattrone*, 895 F.2d at 926 (quoting *Pacor*, 743 F.2d at 995).

The court in *Quattrone* went on to conclude, based upon the *Pacor* reasoning, that the outcome of the section 6672 liability suit between Phillip Quattrone and the IRS, like the suit between Higgins and Pacor, would in no way affect the debtor's liability to the IRS under section 6672. Similarly, the outcome of this action to determine MESC's authority to transfer the debtor's experience rating to JOSI and to determine JOSI's liability under the Michigan Employment Security Act (MESA), Mich.Comp.Laws Ann. § 421.1 *et seq.*, will in no way determine any rights, liabilities, or course of action of the debtor nor affect the debtor's liability under MESA.

However, although Wolverine would not be affected until and unless JOSI invoked the indemnification section of the purchase

agreement, we have held that where the parties "are more intertwined than the parties in *Pacor* ... the statute does not require a finding of definite liability of the estate as a condition precedent to holding an action related to a bankruptcy proceeding." *In re Salem*, 783 F.2d at 635. In *Pacor*, the Pacor–Higgins controversy was the precursor to the potential third party claim for indemnification, *Pacor*, 743 F.2d at 995, but unlike this case, the debtor had not agreed pursuant to the reorganization plan to indemnify the third party whose interest was affected by the action for which jurisdiction was sought. Moreover, in this case, unlike Manville's situation in the Pacor–Higgins dispute, the debtor could be affected by the MESC–JOSI controversy and could be bound by res judicata or collateral estoppel. Furthermore, having filed no claim against Manville, Higgins was not a creditor, whereas in this case MESC filed a claim and obtained creditor status. Although we acknowledge the possibility that the MESC–JOSI dispute may ultimately have no effect on the debtor, we cannot conclude that it will have no *conceivable* effect. Accordingly, we find that subject matter jurisdiction exists in the bankruptcy court over the MESC–JOSI dispute.

**C. 28 U.S.C. § 157**

Having decided that subject matter jurisdiction exists over this proceeding, we must now determine the extent of that jurisdiction. *See In re Fietz*, 852 F.2d 455, 457 (9th Cir.1988). Our analysis turns to 28 U.S.C. § 157, the response of Congress to the Supreme Court decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).[16] Section

**16.** Congress passed the Bankruptcy Reform Act, Pub.L. 95–598, 92 Stat. 2549, in 1978, with the goal of creating more efficient procedures for administering estates in bankruptcy. The Act vested the bankruptcy courts with broad jurisdiction; however, the reform was short-lived. In 1982, the Supreme Court decided *Northern Pipeline*, in which it declared the jurisdictional provisions of the Act unconstitutional because, in essence, they vested article III powers in article I judges. *See In re Wood*, 825 F.2d 90,

91–92 (5th Cir.1987). Congress responded with passage of the Bankruptcy Amendments and Federal Judgeship Act of 1984 in which Congress "reenacted the 1978 Act, but divided its jurisdictional grant into 'core' proceedings, over which the bankruptcy courts exercise full judicial power—and 'otherwise related' or 'non-core' proceedings—over which the bankruptcy courts exercise only limited power." *Id.* at 91. Section 1471(b) read exactly as section 1334(b) does now, except that jurisdiction was granted to

157 does not give bankruptcy courts full judicial power over all matters over which the district courts have jurisdiction under section 1334. Except for the bankruptcy petition itself, section 157 divides all proceedings into two categories:

> Subsection 157(b)(1) gives bankruptcy judges the power to determine "all core proceedings arising under title 11, or arising in a case under title 11" and to enter appropriate orders and judgments. Subsection 157(c)[(1)] gives the bankruptcy judge the limited power to hear "a proceeding that is not a core proceeding but that is otherwise related to a case under title 11" and to submit proposed findings of fact and conclusions of law to the district court subject to de novo review.

*In re Wood*, 825 F.2d at 95 (quoting 28 U.S.C. § 157(b)(1) and (c)(1)). Thus, to determine whether the bankruptcy court had the power to enter the order that MESC appeals, the essential distinction is whether this action is a core or non-core proceeding.[17]

While we determined that this matter was at least "related to" the bankruptcy, that determination was for the purpose of determining whether the matter falls within bankruptcy jurisdiction, and we did not need to distinguish between each of the section 1334(b) categories for that purpose. However, the distinction between categories is relevant for purposes of section 157:

> Subsection 157(b)(1) vests full judicial power in bankruptcy courts over "core proceedings *arising under title 11, or arising in a case under title 11.*" The prepositional qualifications of core proceedings are taken from two of the three categories of jurisdiction set forth in section 1334(b): proceedings "arising under" title 11, "arising in" title 11 cases, and "related to" title 11 cases. Although the purpose of this language in section 1334(b) is to define conjunctively the scope of jurisdiction, each category has a distinguishable meaning. These meanings become relevant because section 157 apparently equates core proceedings with the categories of "arising under" and "arising in" proceedings.

*In re Wood*, 825 F.2d at 96 (emphasis in original).

The phrase "arising under title 11" describes those proceedings that involve a cause of action created or determined by a statutory provision of title 11, 1 Collier on Bankruptcy ¶ 3.01[1][c][iii], and "arising in" proceedings are those that, by their very nature, could arise only in bankruptcy cases. *Id.* at ¶ 3.01[1][c][v]. Conversely, if the proceeding does not invoke a substantive right created by federal bankruptcy law and is one that could exist outside of the bankruptcy, then it is not a core proceeding. *In re Wood*, 825 F.2d at 97. Such a proceeding may be *related to* the bankruptcy pursuant to sections 1334(b) and 157(c), but it would not be a core proceeding within the meaning of section 157(b).

The court must look to both the form and the substance of the proceeding to determine whether core status exists. *In re Wood*, 825 F.2d at 97. The proceeding at issue here stands in a rather curious posture. The form of the matter, which began as a motion to enforce the order confirming the reorganization plan, could not exist outside the bankruptcy. Wolverine also invokes on behalf of JOSI a substantive right created by section 363(f) to be free and clear of all claims, interests, and liens. However, the proceeding could also be characterized as one in the nature of a

---

"bankruptcy courts" rather than "district courts."

**17.** Although the bankruptcy court did not address which category of jurisdiction it was using, the fact that it issued an order indicates that it viewed the matter as a core proceeding. Although the district court reviewed the bankruptcy court's order *de novo*, as it would if the bankruptcy court had submitted proposed findings of fact and conclusions of law for a non-core proceeding, the question whether Wolverine's motion should be characterized as a core or non-core proceeding still determines whether proper procedure was utilized. The bankruptcy court does not have the power, absent consent of the parties, to enter final orders and judgments on non-core proceedings. 28 U.S.C. § 157(c); *see also* 1 Collier on Bankruptcy ¶¶ 3.01[2][b][ii] and 3.01[2][d].

declaratory action attempting to preempt MESC from bringing a state law action pursuant to MESA. In that sense, it is an action that could exist outside of bankruptcy where the essential issue is whether JOSI is liable under state law to MESC for Wolverine's experience rating despite the purchase agreement made between JOSI and Wolverine. Furthermore, while Wolverine is the named party, the dispute is really between JOSI and MESC, and suits between third parties that affect the administration of the title 11 case are typically considered to fall within the "related to" category. 1 Collier on Bankruptcy ¶ 3.01[1][c][iv]. Nevertheless, we find that because this action involves issues which arose because of a bankruptcy proceeding—the dischargeability of debts and the confirmation of a plan—and because Wolverine asserts a right based on bankruptcy law, 11 U.S.C. § 363(f), this action is a core proceeding and the bankruptcy court had jurisdiction to enter judgment on the motion. *See In re Wood*, 825 F.2d at 97.

### III.

It is important to emphasize that, having decided that jurisdiction exists, we merely decided the threshold question of whether any judgment which might result from the MESC–JOSI dispute could have a tangible effect on the debtor bankruptcy estate. This jurisdictional inquiry did not involve an inquiry into how the bankruptcy court reached that judgment, or whether that judgment was correct, and therefore does not implicate the merits of the claim itself.

Furthermore, although bankruptcy courts have jurisdiction over the matter, this fact alone does not determine what law controls the disposition of the tax liability issue. *See Robinson*, 918 F.2d at 588.

We now turn to the merits of Wolverine's argument, which assails the district court's conclusion that MESC may assign the debtor's experience rating, including the debtor's negative reserve balance and liability for former employees, to a purchaser of assets in a sale free and clear of liens, claims, and interests. As this argument raises a question of law, we review *de novo* the legal conclusions of the bankruptcy and district courts. *In re Edward M. Johnson & Assocs.*, 845 F.2d 1395, 1398 (6th Cir.1988); *Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir.1987).

The parties are in agreement that under MESA a transfer of the assets of a business to another employing unit transfers all or part of that business's rating account to the new employer. *See* Mich.Comp.Laws Ann. § 421.22;[18] *In re Pine Knob*, 20 B.R. at 716. Conceding that Michigan law imposes successor liability, Wolverine relies on the argument that MESA is preempted by the federal Bankruptcy Code when the transfer is conducted pursuant to a reorganization plan confirmed in a bankruptcy proceeding. Wolverine maintains that the sale to JOSI precludes MESC from assigning the debtor's contribution rate to the successor because the experience rating is an "interest" that was extinguished in a sale pursuant to 11

---

**18.** The parties stipulated that JOSI did not acquire the goodwill or trade name of WRCI and is not using the same employees or format as WRCI. Therefore, they further stipulated that if MESC determines that JOSI purchased less than 75 percent of the assets of WRCI or that JOSI is not continuing the same business as WRCI, then the parties agree that JOSI is not a successor employer. Where the transfer involves more than 75 percent of the assets of the business, the rating account transfers intact if the transferee had no rate of contribution applicable to it before the transfer. Mich.Comp.Laws Ann. § 421.22. Wolverine does not contest on appeal that substantially all of its assets were transferred to JOSI.

Although new employers are initially required to contribute at a set rate of 2.7 percent, *see*

Mich.Comp.Laws Ann. § 421.19, Table A, the contribution rates of statutory successors depend entirely upon the experience ratings of their predecessors. *See* Mich.Comp.Laws Ann. § 421.22(e)(2); *see also In re Pine Knob*, 20 B.R. at 716. Thus, a successor of an employer with a poor experience rating inherits the predecessor's poor record and faces a steep contribution rate from the outset of operations. Because the rating is based on the predecessor's contributions (or lack thereof) and the claims made by former employees, the successor essentially stands in the shoes of the predecessor for purposes of determining the amount of contributions to the unemployment compensation system. *See, e.g., In re Pine Knob Inv.*, 20 B.R. at 716.

U.S.C. § 363(f) of the Bankruptcy Code, which provides for sales "free and clear of any interest in such property."[19] We agree with the district court that the experience rating is not an "interest" within the meaning of section 363(f), and therefore the debtor's rating survives the sale of the radio station to JOSI.

The Supreme Court set out the general law of preemption in *Louisiana Public Service Comm'n v. Federal Communications Comm'n*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986):

> Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation.

*Id.* at 368–69, 106 S.Ct. at 1898–99 (citations omitted). *See also Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 505, 106 S.Ct. 755, 761, 88 L.Ed.2d 859 (1986) ("Congress did not intend for the Bankruptcy Code to preempt all state laws.")

We find no frustration of federal law by MESC assigning successor liability to JOSI, as MESC's transfer of Wolverine's experience rating does not violate the reorganization plan nor clearly conflict with any provisions of the Bankruptcy Code. First, it must be understood, when assessing whether MESA is a barrier to federal objectives, that MESA is part of a comprehensive federal-state system providing for the security of unemployed workers. The tax rate structure utilized by MESC has been certified as complying with the requirements of the Federal Unemployment Tax Act for an experience-based tax rate. 26 U.S.C. § 3301 *et seq.* The federal law and state plans conforming to that law have been upheld as constitutional. *Steward Mach. Co. v. Davis*, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937); *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937).[20]

Second, the reorganization plan does not, contrary to Wolverine's assertions, indicate that the type of interest at issue here was even contemplated by the parties at the time of confirmation. Title 11 U.S.C. § 1141(a) sets forth that a Chapter 11 plan binds all creditors by its provisions whether or not the creditor is impaired and whether or not the creditor files a claim. Part C of article III of the plan, which Wolverine points to as encompassing the interest at issue here, merely provides the method of payment for allowed tax claims of government agencies. MESC does not dispute that its claim for pre-petition liability in

---

**19.** 11 U.S.C. § 363(f) provides as follows:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of such interest;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

**20.** Moreover, provisions of the Bankruptcy Code as well as statutes pertaining to judicial procedure, such as 28 U.S.C. § 959 and 28 U.S.C. § 960, indicate that Congress was mindful of the federal-state system of unemployment taxation and the varying state unemployment compensation laws when it drafted the Bankruptcy Reform Act of 1978. Section 959 requires trustees and debtors-in-possession to operate businesses in accordance with valid state laws. Section 960 states: "Any officers and agents conducting any business under authority of a United States court shall be subject to all Federal, State and local taxes applicable to such business to the same extent as if it were conducted by an individual or corporation."

excess of $7,000 and the accompanying five liens were encompassed by this provision. However, it is not at all clear that the plan, when confirmed, was intended to include Wolverine's experience rating among the claims and interests not allowed by the court. Indeed, the opposite contention is supported by the provision in the purchase agreement, incorporated by the plan, which states that it "shall be construed and enforced in accordance with the laws of the State of Michigan."

■ Third, we can find no evidence in the Bankruptcy Code that Congress clearly intended to preempt state attempts to assign liability for employment history to successor purchasers. Although 11 U.S.C. § 1141(c) states that after confirmation "the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor," and although confirmation of a plan "discharges the debtor from any debt that arose before the date of such confirmation,"[21] 11 U.S.C. § 1141(d)(1)(A), we do not perceive Wolverine's experience rating as attaching to any "property" dealt with by the plan, or as a "claim" or "debt" arising before confirmation.[22] Factors not related to the bankruptcy proceeding itself, such as the past employment experience of Wolverine, are not pre-petition debts and can be considered in determining JOSI's future unemployment tax contributions. *See In re Primrose Bedspread Corp.*, 67 B.R. 659, 661 (Bankr. D.N.J.1986). *But see Beaverton Plastics, Inc. v. Michigan Employment Sec. Comm'n*, No. 87–CV–40177–FL (E.D.Mich. Feb. 11, 1988) (negative reserve account is a debt discharged by bankruptcy).

■ Similarly, while 11 U.S.C. § 363(f) provides that property may be sold "free and clear of any interest in such property," we do not perceive the experience history of Wolverine as an "interest" that attaches to property ownership so as to cloud its title.[23] The application of the rate creates a fund which is to be used prospectively and, in assessing JOSI's contribution rate, MESC is not attempting to collect a pre-petition debt.[24]

The argument presented here by Wolverine is not a new one. In *Pine Knob*, MESC requested the bankruptcy court to deter-

---

**21.** A corporation in Chapter 11 that does not continue in business after plan confirmation does not receive a discharge.

**22.** 11 U.S.C. § 101 defines claim and debt as follows:

(5) "claim" means—
(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;
. . . .
(12) "debt" means liability on a claim. . . .

**23.** The Bankruptcy Code does not define the word "interest." However, *White Motor*, which Wolverine cites in arguing that the court has jurisdiction over this matter, appears to reject Wolverine's argument that general unsecured interests fall within the scope of those interests that can be discharged pursuant to section 363(f):

This section authorizes sales free and clear of *specific* interests in the property being sold;

liens for example. General unsecured claimants including tort claimants, have no specific interest in a debtor's property. Therefore, section 363 is inapplicable for sales free and clear of such claims.

*In re White Motor Credit Corp.*, 75 B.R. 944, 948 (Bankr.N.D.Ohio 1987) (citations omitted).

**24.** Even if we were to assume that unemployment contribution rates fall within the general meaning of "interest" in section 363, the conditions for a sale pursuant to section 363(f) appear not to have been met. Although the language of section 363(f) is in the disjunctive and the sale free and clear of the interest concerned can occur if any one of the conditions of section 363(f) have been met, 2 COLLIER ON BANKRUPTCY ¶ 363.07, not one of the conditions is met in this case. *See supra* n. 19. The first condition is precluded by MESA, MICH.COMP.LAWS ANN. § 421.22; the reorganization plan cannot fairly be construed as manifesting MESC's consent to the discharge of prospective tax liability; the interest is not a lien; there is no bona fide dispute that Wolverine would be liable in the absence of the transfer of its assets, and the only dispute is to the scope of section 363(f) itself; and, because the tax liability uses past performance to gauge prospective liability, money satisfaction is not possible.

mine the rates of contributions to the state unemployment system for several debtors-in-possession. The debtors argued that as debtors-in-possession they were entitled to separate tax treatment, that of a "new employer" with a substantially lower contribution rate. The bankruptcy court first noted that, although it has the power under section 505(a) to determine the amount and legality of taxes incurred by a debtor or his estate, this power is tempered by the principle that, in determining the legality of a state tax, it must give full faith and credit to the state law upon which the tax is based. *In re Pine Knob*, 20 B.R. at 715–716, citing *Arkansas Corp. Comm'n*, 313 U.S. 132, 61 S.Ct. 888, 85 L.Ed. 1244 (1941).[25] In denying the debtor's request that as debtors-in-possession they are legal entities distinct from the pre-petition debtor and entitled to separate tax treatment, the *Pine Knob* court concluded:

> The obligation to contribute to the unemployment compensation system to which the debtors are subject is not an executory contract or an unexpired lease which can be rejected as part of a reorganization. It is a tax, imposed by state law, on certain sorts of business activity. There is no power to reject tax obligations, burdensome or otherwise. The thrust of the language of the Code and that of the Bankruptcy Tax Act is clear. The tax posture of corporate and partnership debtors, with regard to taxes of the sort at issue here, while governed by those statutes, is intended to continue as though a case under Chapter 11 had not been commenced.
>
> . . . .
>
> Where a successor employer acquires the assets of a business and continues its operations, the rating account of that business will transfer to that successor

employer. While such a result may be onerous to the debtors, it is only so as a result of the operation of a statutory formula applied without regard to their status under Title 11. While it is clearly the intent of Congress that tax laws should not hinder the bankruptcy process, their continued operation and applicability after filing a case under Chapter 11 is contemplated by the Code and cannot be said to impose an unfair or inequitable burden upon the debtor. At the time of its adoption the tax provisions of the Code were subjected to close scrutiny and extensively debated. The statute which emerged evidences no intention to allow this Court to alter tax rates established by a correct application of state law in the manner requested by the debtors. . . .

*Id.* at 716–17; *accord In re A.C. Williams*, 51 B.R. at 497–98; *In re Primrose Bedspread*, 67 B.R. at 662. *See also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527–28, 104 S.Ct. 1188, 1196–97, 79 L.Ed.2d 482 (1984).

Wolverine distinguishes *Pine Knob*, *Primrose Bedspread*, and *A.C. Williams* by noting, correctly, that each of these cases deals with debtors-in-possession who were the same entities that had possession and control of the pre-petition assets and that conducted the business prior to commencement of the petitions for reorganization. According to Wolverine, where a nondebtor purchases the assets through the bankruptcy court at a sale free and clear of liens, claims, and interests, as in the case at bar, the purchaser is truly a new entity with regard to the MESC contribution rate.

We are not persuaded by this argument, however, and we find the holding of *Pine Knob* to be applicable. We do not perceive

---

**25.** Although we have decided that 28 U.S.C. § 1334(b) empowers the bankruptcy court to hear and determine the legality of the contribution rate imposed on JOSI by MESC, this power is tempered by the principle that the court must give full faith and credit to the state law upon which the tax is based. *Arkansas Corp. Comm'n v. Thompson*, 313 U.S. 132, 61 S.Ct. 888, 85 L.Ed. 1244 (1941). Further, "[a]lthough bankruptcy courts have the power to determine the

tax liability of the debtor pursuant to section 505, 'there is nothing in the history of bankruptcy or reorganization legislation to support the theory that Congress intended to set the federal courts up as super-assessment tribunals over state taxing agencies.'" *In re A.C. Williams Co.*, 51 B.R. 496, 501 (Bankr.N.D.Ohio 1985) (quoting *Arkansas Corp. Comm'n*, 313 U.S. at 145, 61 S.Ct. at 892).

that the distinction suggested by Wolverine is significant for purposes of determining who can reject tax obligations as part of a reorganization. While the unemployment history of a debtor may more appropriately be characterized as "belonging" to a debtor in possession than to a purchaser of the debtor's assets, if the Bankruptcy Code does not preempt state law regarding the tax liability of debtors-in-possession, then we see no reason why federal law should extend greater protection to nondebtors. In both situations, the unemployment tax liability arises only by virtue of the successor entity's post-petition employment of workers. The tax liability sought to be imposed on JOSI by MESC bears no relationship to Wolverine's status as a debtor involved in bankruptcy proceedings, and no one argues that MESC could not use Wolverine's experience rating had Wolverine not sold its assets to JOSI. We see no reason to hold that the Bankruptcy Code provides JOSI with a more preferable tax rate than employers who purchase the assets of a predecessor not in bankruptcy.

### IV.

■■■ Wolverine also contends that MESC may not include in the computation of JOSI's experience rating the unemployment compensation payments which were made, subsequent to the sale of Wolverine's assets to JOSI, to former employees of Wolverine who did not work for JOSI. Like its argument concerning the experience rating generally, Wolverine argues that the obligation to former employees was a claim or interest that was extinguished by the sale of Wolverine's assets to JOSI.

The foregoing reasoning regarding the transfer of Wolverine's experience rating applies equally to MESC's use of unemployment compensation payments to former Wolverine employees. The transfer of the chargeable benefits component, which Wolverine complains of here, is merely one of the three factors provided by statute for establishing an employer's experience rating. Where we have found no frustration of federal law in MESC's transfer of Wol-

verine's experience rating, we find no prohibition against MESC utilizing the chargeable benefits component, one of the components for calculating that experience rating.

### V.

■■■ While Wolverine maintains that the negative reserve balance was a debt or right to payment that must be eliminated in its entirety when calculating the contribution rate of the purchaser, MESC argues that the entire negative reserve should transfer without any set-off for its allowed claim for unpaid taxes. Our holding with regard to the transferability of Wolverine's experience rating applies not only to the chargeable benefits component but also to the account building component, which also is directly related to the employer's employment history and is merely another component in calculating the experience rating. However, we modify this holding in the same manner as the district court and find that the negative reserve balance should be reduced by the amount of MESC's allowed claim for unpaid taxes against the debtor.

As a general proposition, confirmation of a Chapter 11 plan "discharges the debtor from any debt that arose prior to the date of confirmation." 5 Collier on Bankruptcy ¶ 1141.01[4][a] (15th ed. 1990). As MESC concedes, therefore, Wolverine's preexisting liability for past due contributions in excess of $7,000 and the accompanying five liens were erased by discharge. The district court ruled that, because the plan encompassed MESC's claim for past due contributions totaling $7,606.91, that claim should be conceptualized as satisfied *in toto* and not used for purposes of establishing the transferred Wolverine experience rating.

We are not persuaded by MESC's argument that by including the allowed tax liability claim in the negative reserve balance, it is simply utilizing the claim as an actuarial device for purposes of calculating the post-confirmation tax rate, and is not charging JOSI for a pre-petition debt discharged in bankruptcy. To allow MESC to

utilize the allowed claim in this fashion would directly conflict with provisions of the Bankruptcy Code.

The plan provides in part C of article III for the debtor to pay MESC the full pre-petition indebtedness (MESC's claim for past-due contributions totaling $7,606.91), plus interest. This provision is in conformance with 11 U.S.C. § 1129(a)(9)(C) that an employment tax on wages shall be dealt with in a Chapter 11 plan, absent agreement to a different treatment, as follows:

> [T]he holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

Thus, Congress has specified in section 1129(a)(9)(C) a means for fully satisfying tax creditors. Further, confirmation of a plan "discharges the debtor from any debt that arose before the date of such confirmation," 11 U.S.C. § 1141(d), and MESC's allowed claim is certainly a "debt" in that it is a "liability" on a "right to payment." 11 U.S.C. § 101(5), (12).

Through these provisions, Congress has legislated the equivalent of payment as of the date the bankruptcy petition was filed that discharges the debt by virtue of the confirmation of a plan. *See In re Active Steel Erectors, Inc.*, 53 B.R. 851, 853 (Bankr.D.Alaska 1985). Therefore, it would be in conflict with the provisions of sections 1141 and 1129(a)(9)(C) to allow MESC to charge JOSI a higher contribution rate based on a debt discharged by a plan to which MESC is bound. *See In re Draggoo Elec. Co.*, 57 B.R. 916, 920 (Bankr.N.D. Ind.1986).[26]

The order of the district court is AFFIRMED.

---

**26.** Neither *Draggoo* nor *Active Steel* is inconsistent with our holding that factors not related to the bankruptcy proceeding itself, such as the experience rating of Wolverine, can be considered in determining JOSI's unemployment tax contributions. *See In re Primrose,* 67 B.R. at 660, 661.